Alright, good morning Mr. Margolis and Numa, you've got ten minutes but you've reserved three for rebuttal, is that correct? Yes. Okay, that gives you seven out of the gate, you may proceed. Thank you, may it please the court, my name is Zachary Margolis-Onuma and I represent the defendant, appellant Alexander Zhukov, in this appeal of his criminal conviction. Our central point on appeal really revolves around government exhibit one, which is aptly named. That's the list, it's found at page A-2007 of the appendix, it's the list of IP addresses with the statement at the top of it that they are identified as being used by the meth bot ad fraud operation from October 2016 through December 2016. Right, but that part of the exhibit was objected to, right? Correct. Just the header, but the content of it was not, right? Well, I think if you look at the colloquy, the initial objection got a little bit lost. I think I said, okay, when the judge said, well, it's going to come in anyway. So, I would argue, I mean, I think it's plain error. I don't dispute the idea that it's plain error, but what it is, is it's a scientific analysis. It's a report, just like a drug test. It's a list, isn't it a list? It's a list of conclusions. It's a list of IP addresses. Correct. The witness did her own independent review of the materials, the logs, the databases, files, and she found that virtually all of the IP addresses in exhibit one, she found during the course of her investigation. Why isn't that a sufficient foundation? Your Honor, that was not in her expert reports. There were multiple expert reports. They're cited by the government in their- All right, so there are two parts. Do you agree that with her testimony, a proper foundation was laid, and then your objection is that it wasn't properly disclosed? No, because she didn't do the analysis. She maybe checked it over, but she didn't do it. So, it's a bulk homing. So, yeah, there's two objections. What's the difference between checking it over her and doing the analysis? It's precisely the fact pattern in bulk homing, where you have one scientist does the analysis, and another scientist comes to court and doesn't redo the analysis, but just kind of reads what the other scientist said. So, there's two objections to this coming in this way. One is the lack of expert notice, and that can be found by the fact- I think really not only the lack of that particular point in Lena Lowenstein's notice, but also the total lack of expert notice with respect to the white ops witness, who was incorrectly characterized as a fact witness and not an expert witness. So, that's number one. And number two, there's a confrontation clause slash hearsay objection, which is that in this situation where scientific testing, way beyond the can of the average juror, frankly, beyond the can of our law office, is brought in, that it has to be, like a scientific test for drugs or for alcohol in the other Supreme Court case, the person who conducts the test has to be available to be cross-examined. And really- But Lowenstein said that the ones that were on Exhibit 1 were on Zhukov's servers, right? She didn't say all of them, and she didn't- The ones on the list, she said, were from the servers. No, no, it's not that they're from the list. It's that they matched. Well, they matched what's on the servers. But not identically. She said she- Most of them. Let me explain. Most of them? Can I try to explain? Yeah, she said most of them. So, what she's doing is she's got- No, no, you're confusing the white ops document, and then there's Government Exhibit 1, which is a different document, right? No, it's not a different document. Well, it is a different document, right? Your Honor- The government's exhibit is derived from the white ops document. It is an attachment at the end of the white ops document that wasn't admitted. And it was explained thoroughly by Theodorakis, the non-expert witness, who didn't conduct the test. So, it comes in- The way it unfolds is this. I cross her in very general terms about it. The government on redirect says, well, let's just bring in the exhibit then so we can get more precise on the cross. And then I'm wishy-washy, granted, on my objection to that without really realizing what it was or the import of it. So, it comes in at that point. And what she says is, okay, I looked at these servers that were seized, essentially, from your client. And here and there, there were IP addresses. And I looked on the white ops list, and lo and behold, they matched. I didn't know that was going to come in. And, by the way, that was crucially important. It was referred to multiple times in closing and the government's closing and the rebuttal closing. And in my closing, sort of questioning it. So, that matching by Lena Lowenstein was very important to the case. It comes in there. And then it gets explained by the white ops witness. And the objection I have to that is twofold. And I think the white ops- We'll step back for a moment. Yeah. Is there any real dispute that your client used 2,000 or 3,000 computers to fake Internet activity for purposes of generating income from advertisements? The way you just put it, Your Honor, I think he testified to that. So, it's pretty hard for me to dispute it. So, however- What's the injustice in saying the admission of government's Exhibit 1 was not a plain error? But he- I mean, it's a plain error only if it's a miscarriage of justice, et cetera. I mean, a couple of things. We were forced into that tactical decision because we did not know that they were going to be able to do this matching. If we had- They wouldn't be able to do this matching with admissible evidence. If we had known that there was not going to be admissible evidence for the white ops report, that they were not going to be able to bring in a white ops- Was the matching wrong? No, I misstated. Was the witness wrong? I'm not saying that. I misstated. No, no, no. I'm just- Okay. I didn't take it. But if the witness wasn't wrong, and indeed there was, they substantially matched. I mean, where does that leave us? Well, it leaves me without having had an opportunity to move under Daubert to question the methodology used to generate that list. So it undermines the adversarial process in a way that deserves, in my view, a new trial since both parties relied on it. You don't contest the accuracy of it. We could not test the accuracy of it. You don't contest the accuracy of it. Well, no, I do. I contest whether or not, and I did on closing, whether or not that list can be associated with Zhukov. So let me put it another way. They got stuff from Zhukov through a long chain, which I don't contest. It was the servers. But the white ops list was out in the wild. That's them basically spying on you all, right? Every time you click on an ad, white ops spies and looks and sees what you're up to. And they have enormous quantities of data that they say, through their magic sauce, can be then associated back to somebody. And it's that magic sauce that I would like an opportunity, a meaningful opportunity to contest that I think Daubert gives us a right to contest, and that the confrontation clause requires the person doing the analysis to appear in court. The government takes the position that not only did you not object, but you affirmatively used it. You waived any objection by affirmatively adopting it and using it for your own purposes strategically in the trial. Well, I think that's wrong, Your Honor, in the sense that we did argue against it on closing. And you can find that at transcript page 3308. I'm not sure it's in the appendices, but it's in the transcript, where I argued about the white ops witness got to white ops not when the investigation was going on. He hadn't worked on the report. I'm quoting from the transcript. He read the report when he got there and was telling us about it. Where were the people who actually were involved in it? I'm attacking the white ops report and, by extension, this list. It's also belied by the fact that the government argued that the list was reliable in their closing argument. And finally, tactically, we were forced into that because we didn't have a chance to contest it beforehand. So I don't think we waived anything. I think we chose a trial strategy that was based on the information we were provided before trial that was inaccurate information. I see my time is up. There's other questions. Thank you. We reserve three minutes for rebuttal. We'll now hear from Ms. Kamati-Reddy. May it please the court, my name is Sarita Kamati-Reddy. I'm an assistant United States attorney in the Eastern District of New York, and I was trial counsel below. I will begin by simply addressing Mr. Margolis-Onuma's arguments. First of all, with respect to the two prongs that he just articulated, one, a lack of expert notice, and two, the inability to challenge the reliability of white ops' analysis. With respect to expert notice, I want to be clear, and the government appendix sets forth the letters in which we provide extensive notice of these witnesses, even though we did consider them fact witnesses. The government provided the equivalent of Rule 16 disclosures. Mr. Margolis-Onuma claimed just now that he did not know that Mr. Theodorakis was going to testify about GX1. At GA 239, it is a letter from the government prior to trial informing the defense that, among other things, Mr. Theodorakis was going to testify about GX1. In addition, they were on notice that Ms. Lowenstein would testify that certain IP addresses, including the ones in GX1, were found on the servers because it was part of Ms. Lowenstein's expert notice that was disclosed, and it was part of her exhibits. That's GX5. Her testimony was that what's on Government Exhibit 1 are IP addresses that she found on Zhukov's servers. Am I right about that? Yes, Your Honor, and the sequence here is important. First, she testified in direct examination that she extracted a list of IP addresses that she found on Zhukov's servers, and that was admitted on direct as Government Exhibit 5. On cross-examination, Mr. Margolis-Onuma cross-examined her about another hypothetical list that no one in the courtroom had seen, but both parties knew what that was, and that was the GX1 list. Mr. Margolis-Onuma invited the admission of this list, which was only admitted on redirect. Do the IP addresses on GX5 also appear on GX1? Largely. That's the point that Ms. Lowenstein made. Nearly all of them match. And so GX5 was already part of the record. Mr. Margolis-Onuma was seeking to essentially impeach in advance the upcoming White Ops witness because we had provided notice. When you say largely, what are we talking about, numbers? Your Honor, there's not a percentage in the record. She testified nearly all. And the important thing is it's not just these two lists. These IP addresses appear throughout the record. They appear in business records in which Mr. Zhukov registers those IP addresses with Internet registries, leases those IP address records, submits them to be associated with various companies and various locations. He chats about them with co-conspirators. And so all of those different pieces of evidence corroborate that the traffic coming from these IP addresses can be attributed to Mr. Zhukov. Now, as to the second point, that there should have been an opportunity for the defense to challenge reliability, well, it's connected with the first point. They knew exactly who these witnesses were. The government provided advance notice in writing, orally during discovery calls, and repeatedly that we would be calling these witnesses for this purpose. And they could have moved to reclude the witnesses' testimony in its entirety. But second, these witnesses, and this is a very important point, these witnesses were not being called to testify that, in fact, the traffic was fraudulent. They were being called to testify that they had observed traffic from these IP addresses. Those IP addresses' traffic had certain characteristics that were unique to them and that were common among them. The actual reliability, in other words, whether these companies were correct in flagging the traffic or not, was not an issue. Because we had direct access to Mr. Zhukov's servers, and we had an expert witness, Ms. Lowenstein, testify that it was fake traffic. The purpose and the relevance of these witnesses was to show that the fraud detection companies, whose clients are the victims in this case, the American companies that are out there trying to only advertise to humans, the fraud detection companies tracked various aspects of the traffic, they caught some, they didn't catch others, and the fraud therefore worked, and that the traffic associated with these various IP addresses can be attributed to this scheme and therefore is connected to the different witnesses that testified. The New York Post, the witness who said, I looked at this list and looked at the impact it had, and we did, in fact, lose money, lose opportunities as a result of this traffic. The Double Verify, a fraud detection company that testified that we looked at this list and saw that multiple IPs, the traffic from multiple of these IPs went through the Staten Island, the eastern district of New York. So the relevance here was to establish material misrepresentations, to establish venue, to link up traffic that was created by Mr. Zhukov to where it ended up, to the victims' computers, but not to use cybersecurity firms' analysis as expert opinion testimony. Unless the court has any further questions, we rest on our briefs and we ask that you refer. Thank you. All right. Mr. Margolisano, you've got three minutes. Yes. Respectfully, I think Ms. Komet already has got a couple things wrong there. First of all, I'm looking at the expert notice related to Lena Loewenstein, which is, I don't have the, it's the two pages, a couple pages after she cited, it's the April 13th, 2021 notice. There's a whole section on all the different expert notices that Lena Loewenstein, relating to Lena Loewenstein, and nowhere in either this letter or in the underlying documents, which we can make available to the court, does she say that I looked at the list of IP addresses provided by White Ops and matched it up to IP addresses I found on the servers. That came as a surprise, and I don't think anybody planned for it at the trial. That's number one. So that's not in the expert notice. Number two. That doesn't require any kind of expertise, does it? I mean, that's just comparing just two lists, right, and saying whether they're similar. Your Honor, I never got a list from Lena Loewenstein of IP addresses she found. That wasn't part of her expert opinion that these IP addresses were used by Zhukov. That's something that came out at the trial, and it came out not as a scientific test, like the White Ops list. It came out as her sort of seat of the pants cross redirect saying, oh, yeah, a lot of those matched. Well, where's the list where they matched? How can I rebut that if I don't have your scientific analysis? What about Government Exhibit 5? Sorry? Government Exhibit 5. If that's what I think it is, that's another White Ops list, right? The government said that many of the IP addresses on 1 were also on 5. I don't – I'm trying to remember what 5 is. I don't remember – I could be wrong. I don't remember any list that – We'll find it later. I also took a quick look. I couldn't find it. We'll find it later. I don't think that there was any list generated by Lena Loewenstein. If there were, I wouldn't be making this argument because then we would have looked to see what they matched. The other concern I have is she's saying, well, they substantially matched or a lot of them matched. Well, that means some of this other suspect traffic was totally unrelated to Zhukov. So where does it come from? And, again, more importantly, procedurally, how do I test it as an advocate? Finally, I think the last half of Ms. Comitoretti's argument really goes to how crucial an issue this was at the trial. The so-called victims in this case say, well, the reason we know that we're victims is not because anybody complained. It's because we looked at the list that White Ops put out, and we had traffic coming from that list. And you're telling us it's bot traffic. We don't actually know. The advertisers aren't complaining, but it's on your list from White Ops. Given those circumstances, Mr. Zhukov had every right to understand, as a scientific analysis under the Daubert rules and the federal rules 701, 2, and 3, how that list was generated. Thank you very much. Thank you. We will reserve decision.